NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| BANDA , et al., | : | |
| | : | |
| Plaintiffs, | : | Civil No. 07-4508 (WJM) |
| | : | |
| v. | : | |
| | : | |
| JON CORZINE , et al., | : | **O P I N I O N** |
| | : | |
| Defendants. | : | |

---

**APPEARANCES:**

> JOHN BANDA,
> FRANK SANCHEZ,
> EDWARD SALERNO,
> WALTER HARRELL,
> RICHARD BAGAROZY,
> CHARLES HAINES,
> JAMES WILLIAMS,
> THOMAS BRIAN RODRIGUEZ,
> CLINT WALKER,
> DENNIS MARINO,
> JOSEPH CONKRIGHT,
> ROBERT M. QUICK, III,
> TERRY CONN,
> MARK CREVELING,
> JERRY DELLASTRITTA,
> JAMES HOWARD,
> Plaintiffs Pro Se
> Special Treatment Unit
> Avenel, New Jersey 07001,

**William J. Martini**, District Judge

This matter is before the Court upon submission of a joint civil complaint (hereinafter "Complaint"), pursuant to 42 U.S.C. § 1983, by above listed Plaintiffs (hereinafter, collectively, "Plaintiffs"), who are involuntary civilly-committed persons,

pursuant to the Sexually Violent Predator Act ("SVPA"), N.J. Stat. Ann. § 30:4-27.24 et seq., and are confined at the Special Treatment Unit, Annex, Avenel, New Jersey (hereinafter "Facility"). See Docket Entry No. 1, at 8. Plaintiffs (a) putatively "self-certified" themselves as a "class," and (b) allege that their constitutional rights were violated, on August 30, 2007, by Defendant Jon Corzine, Governor of the State of New Jersey; Defendant George Hayman, Commissioner of New Jersey Department of Corrections; Defendant Bernard Goodwin, Administrator of the Facility; Defendant Cindy Sweeney, Assistant Superintendent of the Facility; Defendant Ann Milgram, Attorney General for the State of New Jersey; Defendant Merrill Main, Clinical Director of the Facility; Defendant Tina Spanuolo, Supervising Program Specialist at the Facility; and one hundred John/Jack/Jane/Joan Doe Defendants, who are corrections officers or public advocates employed by the State of New Jersey, as well as Defendant John Doe, who is a "Regional Commander of Department of Corrections." See id., caption. Seeking to file their Complaint in forma pauperis, Plaintiffs submitted their affidavits of indigence. See Docket Entries Nos. 1-2 to 1-17, inclusive. Based on Plaintiffs' affidavits of indigence, the Court will grant Plaintiffs'

application to proceed in forma pauperis, pursuant to 28 U.S.C. §
1915, and order the Clerk of the Court to file the Complaint.[1]

## BACKGROUND

## I. Allegations Appearing to Be Common to All Plaintiffs

Plaintiffs' allegations relate predominantly to the events
that took place at the Facility on August 30, 2007.  According to
Plaintiffs, the chain of August 30th events started at 8:25 A.M.
with the appearance of an unnamed corrections officer, who was
"with a 'gun.'"[2]  Compl. at 10.  Allegedly, five minutes later, at

---

[1]

A review of the absence of three qualifying dismissals,
pursuant to 28 U.S.C. § 1915(g), is inapplicable to Plaintiffs in
view of Plaintiffs' status as involuntarily civilly-committed
persons, regardless of multiple previous dismissals of claims
brought by certain Plaintiffs.  (For instance, Plaintiff Banda
filed with the Court and had the following § 1983 actions dismissed
by the Court for failure to state a claim: Banda v. Brown, 2007
U.S. Dist. LEXIS 39955 (D.N.J. May 30, 2007); Banda v. Burlington
County, 2006 U.S. Dist. LEXIS 68791 (D.N.J. Sept. 26, 2006); Banda
v. McGreevey, 2006 U.S. Dist. LEXIS 66907 (D.N.J. Sept. 19, 2006);
Banda v. N.J. Special Treatment - Annex, Civ. No. 05-2078 (D.N.J.
Sep. 8, 2005); Banda v. N.J. Dep't of Mental Health Servs., 2005
U.S. Dist. LEXIS 19560 (D.N.J. Aug. 31, 2005); Banda v. New Jersey,
2004 U.S. Dist. LEXIS 28503 (D.N.J. Dec. 16, 2004); Banda v.
Morgan, Civ. No. 02-5610 (D.N.J. Dec. 24, 2002); Banda v.
Bartfield, Civ. No. 00-1851 (D.N.J. Oct. 11, 2000); Banda v.
Milford Police Dept., Civ. No. 00-669 (D.N.J. July 6, 2000)).

[2]

Plaintiff's Complaint reads, verbatim, "[an] officer comes
into [the Facility] with a 'Gun.'"  Compl. at 10.  The Court is not
entirely clear as to what connotation(s) Plaintiffs were trying to
convey by capitalizing and putting in quotation marks the word
"Gun."

8:30 A.M.,[3] Plaintiffs, together with other civilly-committed sexually violent predators confined at the Facility (hereinafter, collectively, "Detainees"),[4] were "ordered to the Dayroom [and] told to line up and face the wall, [and] keep eyes forward." Id.

Plaintiffs allege that, five minutes later, they were "pat-searched and led to the Rec[reation] Yard." Id. Seven minutes after they entered the recreation yard, Plaintiffs were handed cups and served with, approximately, half-a-cup of water per person. See id. at 10, 14. From this point on, water was re-served to Plaintiffs on half-an-hour or hourly basis, although Plaintiffs were finding the supply of water insufficient, and the water itself insufficiently chilled. See id.

According to Plaintiffs, at 8:45 A.M., that is, thirteen minutes after Plaintiffs were removed into the recreation yard, the Facility officials brought drug-sniffing canines into the Facility and began a search for controlled substances; the search inside the Facility continues for one hour and twenty-two minutes, and it was followed by a one hour and thirteen minutes search of the external parts of the Facility and adjoining trailers. See id. at 10, 12. After the search was completed, Plaintiffs were ordered to line up

---

[3] All references to particular points in time, that is, in hours and minutes, refer to the events of August 30, 2007, unless another date is expressly stated.

[4] The total number of Detainees at the Facility is, allegedly, about 210. See Compl. at 14, 18-19.

in the recreation yard "in the Hot Sun,"[5] and, fifteen minutes later, an unspecified number of Detainees, which might or might not have included Plaintiffs (hereinafter "Group One"), was brought into the Facility for lunch.[6] See id. at 11. About half an hour later, another group of the Detainees, which might or might not have included Plaintiffs (hereinafter "Group Two"), was brought into the Facility for lunch. See id. The remaining Detainees (hereinafter "Group Three") were brought into the Facility to consume lunch in unspecified sub-groups and time increments, with the last Detainee being brought into the Facility no later than at 1:25 P.M., that is, about two hours after the entire lunch service started.[7] See id. Plaintiffs assert that Plaintiffs experienced "intimidation" during their return to the Facility as a result of a "show of force" which ensued from the fact that the Facility officers were "holding . . . 'Riot Guns.'" Id.

---

[5]

Just as with the word "Gun," the Court is not clear as to the reason for Plaintiffs' capitalization of the words "Hot Sun" (or other occasional capitalizations). With respect to the "Hot Sun" term, the Court presumes that Plaintiffs intended to convey that being exposed to direct sunlight was uncomfortable to Plaintiffs.

[6]

It appears that all those Detainees, who were brought into the Facility for lunch, were free to remain in the Facility after the meal. See Compl. at 11.

[7]

The Detainees that were taking medications were brought into the facility for consumption of their medication and, apparently, lunch, no later than at 1:03 P.M., that is, about an hour and a half after the lunch started. See Compl. at 11.

Plaintiffs assert that, within three to four minutes after the Group Three entered the Facility, the Groups One and Two were allowed access to their sleeping quarters, while the Group Three, which continued consuming lunch meals, remained in the Mess Hall. See id. Plaintiffs also allege that, about ten minutes after the Groups One and Two were allowed access to their sleeping quarters, the Detainees, which might or might not have included Plaintiffs, were denied (a) access to bathrooms for the period of five minutes, and (b) access to showers for about ten minutes. See id. at 12. The Facility's "Dayroom" and Mess Hall became, allegedly, available for regular use by the Detainees one hour and twelve minutes after all the Detainees returned to the Facility. See id.

## II. Claims Appearing to Be Unique to Particular Detainees

In addition to the foregoing facts, Plaintiffs' Complaint also alleges numerous facts that appear to (a) be unique to particular Plaintiffs, or (b) concern Detainees other than Plaintiffs in this action.

### A. Allegations Not Related to Listed Plaintiffs

The Complaint contains the following allegations made with respect to identified Detainees *not* named as Plaintiffs in this action, as well as *unidentified* Detainees:

(1)  An allegation that Detainee "Dressler [was] locked up for saying that he need[ed] to use the [b]athroom" and then "taken to Kearny S.T.U. lock-up."  Compl. at 11-12.

(2)  An allegation that Detainee "Ramos [experienced chest pains and was] hardly able to stand up."  Id. at 12.

(3)  Allegations that unnamed Detainees "suffered [h]eart [a]ttacks, [h]eat [s]trokes, and [s]eizures while [being in the recreation yard because] they had not been permitted to bring out their own hats.  [Also, certain unnamed Detainees] were [allegedly] forced out into the yard [in] just boxer shorts [because they] weren't . . . permitted to get dressed . . . ."  Id. at 14.

### B.  Allegations Unique to Certain Individual Plaintiffs

Plaintiffs' Complaint alleges that certain individual Plaintiffs experienced the following:

### 1.  *Plaintiff Haines*

Plaintiffs allege that, five minutes after being brought into the recreation yard, Plaintiff Haines "g[o]t [a] mild [h]eart [a]ttack and [was] rushed to see [a] [n]urse."  Compl. at 10. Apparently, Plaintiff Haines was treated by a nurse and was able to return to the recreation yard sometime before 12:15 P.M.  See id. at 11.  However, Plaintiff Haines experienced his second "mild

heart attack" and was taken to see a nurse at 8:30 P.M., about seven hours after all the Detainees were returned in the Facility. See id. at 12.

### 2. *Plaintiff Howard*

Plaintiffs assert that, at 12:15 P.M., Plaintiff Howard "f[e]ll out [and was] declared dead [by an unnamed entity but then] was revived," either by the same or by another unnamed entity.[8] Id. at 11. Upon Plaintiff Howard's alleged clinical death (and potential "revival"), the Facility officials called for an ambulance, which took Plaintiff Howard to a hospital at 1:00 P.M.[9] See id. at 11, 13 (stating that Plaintiff Howard developed a fever,

---

[8] The Court is not entirely clear as to the meaning of the phrase that a certain Plaintiff "fell out," same as to the meaning of the fact that a certain Plaintiff was "declared dead [but then] was revived." The Court presumes that the former indicates that a certain Plaintiff experiences an ailment or another medical condition, and the latter implies that a Plaintiff experienced a clinical death.

[9] The Complaint neither specifies the time when the ambulance was called and arrived to the Facility nor details whether the "revival" was performed by the ambulance staff and, if so, the time period consumed by this "revival" procedure. See generally, Compl. Hence, the Court is unable to estimate the promptness of actions by the Facility officials or by the ambulance staff. While being silent as to these important matters, the Complaint notes both Plaintiffs' dissatisfaction with the fact that the ambulance left the Facility without having its siren turned on, as well as Plaintiffs' opinion that Plaintiff Howard was taken to an unsuitable "prison" hospital, see id. at 11, 13, even though Plaintiff Howard was taken to St. Francis Hospital, a general medical facility. See id.

and that a "[n]urse [was] seen giving C.P.R. to [Plaintiff] Howard [during the time when Plaintiff Howard was] on [his] way to [the] ambulance"). Plaintiff Howard returned from the hospital to the Facility on September 7, 2007, that is eight days after his alleged clinical death. See id. at 13.


### 3. *Plaintiff Rodriguez*

According to the Complaint, Plaintiff Rodriguez "fell out" at 1:16 P.M. as a result of having a "seizure" of unspecified nature. See id. at 11. Immediately thereafter, the Facility officials and a nurse attend Plaintiff Rodriguez, placed him in a wheelchair and took him into the Facility. See id. Plaintiff Rodriguez returned to his sleeping quarters at 2:00 P.M., that is, 45 minutes after his seizure. See id. at 12. Plaintiff Rodriguez, however, was taken to see a nurse at 4:25 P.M., about two and a half hours after his return. See id. While it appears that Plaintiff Rodriguez recovered from the unspecified ailment that caused his visit to the nurse at 4:25 P.M., he experienced a "relapse" of unspecified nature at 6:10 P.M., on August 31, 2007, that is, about 26 hours later. See id. at 13. Allegedly, following the "relapse," Plaintiff Rodriguez spent about eighteen hours in the nurse's care and fully recovered. See id.

Page 9 of 63

### 4. *Plaintiff Williams*

The Complaint alleges that, at 4:25 P.M., that is, three hours after all the Detainees returned to the Facility, Plaintiff Williams was taken to see a nurse for a reason not clarified in the Complaint. See id. at 12. Apparently, Plaintiff Williams was placed in a wheelchair (by an unknown entity) when he was taken to see the nurse. See id. Twenty minutes later, for reasons not clarified in the Complaint, Plaintiff Williams was taken to a hospital. See id. Plaintiff Williams returned to the Facility the next day, August 31, 2007, at 3:45 P.M. See id. at 13.

### 5. *Plaintiffs Quick, Conkright, Conn, Walker and Salerno*

Plaintiffs contend that: (a) Plaintiff Quick "g[o]t heat stroke and [was] taken to see [a] nurse" at 1:20 P.M., that is, five minutes prior to the last Detainee being brought into the Facility and about two hours after the lunch meals started; (b) Plaintiff Conkright "fell out" and was taken to see the nurse for an unspecified medical condition at 1:25 P.M., that is, after he was already in the Facility; (c) Plaintiff Conn similarly "fell out [and was] taken to see [a] nurse" for an unspecified medical reason at 1:40 P.M., that is, after he was already in the Facility; (d) Plaintiff Salerno also experienced unspecified "medical emergency" and was "taken to see the nurse" at 4:45 P.M., that is, three to five hours after he returned to the Facility, and was directed to

return to the nurse three hours later for reasons unstated in the Complaint; and (e) Plaintiff Walker was taken to see the nurse at 3:00 P.M. for an unspecified medical reason and returned to his sleeping quarters half an hour later.  See Compl. at 11-12.

### 6. *Plaintiffs Banda and Marino*

Finally, according to the Complaint, on September 2, three days after the events of August 30, 2007, Plaintiffs Banda and Marino went to see a medical doctor complaining about having sun poisoning.  See id. at 13.  Plaintiffs Banda and Marino were experiencing "swollen puffy eyes," and Plaintiff Banda allegedly had a "bad sun[]burn on his f[o]r[e]head and nose."[10]  Id. Responding to their complaints, the Facility's doctor "prescribed Tylenol for the puffy swollen eyes [and] Silver Sulfadiazine Cream for the sun[]burn."  Id.

### 7. *Plaintiffs Harrell, Bagarozy, Creveling, Sanchez and Delstritta*

The Complaint is silent as to any ailments or medical conditions experienced by Plaintiffs Harrell, Bagarozy, Creveling, Sanchez and Delstritta.  See generally, Compl.

---

[10]
In addition, Plaintiffs Banda and Marino speculate that they might eventually develop "skin cancer" as a result of their three-to-five-hour exposure to the sun during the events of August 30, 2007.  See Compl. at 13.

## III. **Plaintiffs' Legal Contentions**

### A. **General Claims**

Plaintiffs assert that the search for controlled substances performed by the Facility officials was an "unlawful 'prison' search" impermissible with respect to involantarily civilly-committed Detainees. Compl. at 8. Plaintiffs further maintain that the mode in which the search was conducted amounted to a cruel and unusual punishment in violation of Plaintiffs' constitutional rights since: (a) "there was [n]o shade in the [recreation] yard with the exception of a small tent[,] which could not accommodate" all 200 Detainees simultaneously; (b) Detainees were "forced out into the [recreation] yard on a 90 to 95 degree day"; (c) re-servings of water to the Detainees was no more frequent than every half an hour and the water served was "usually warm"; and (d) corrections officers "brandished M-16 style guns with individualized mace balls, [and] other weapons[,] such as batons and night sticks[,] were also brandished." See id. at 13-14.

Plaintiffs also allege that their rights were violated when the Facility officers called the Detainees "retards" or "mental cases." See id. at 13.


### B. **Claims Against Identified Defendants**

Plaintiffs allege that the named Defendants are liable for Plaintiffs' injuries for the following reasons:

(1) Defendant Corzine is liable to Plaintiffs because he is "the Governor for the State of New Jersey [and] has supervisory authority over all N.J. employees . . . . He knew of should have known about the [illegal] conduct" complaint about by Plaintiffs. Compl. at 3.

(2) Defendant Hayman is liable to Plaintiffs because he is "the Head [and] Chief Executive Officer for the Dep[artment] of Corrections . . . . He knew or should have known about the [illegal] conduct" complaint about by Plaintiffs. Id. at 4.

(3) Defendants Goodwin and Sweeney is liable to Plaintiffs because they "allow[ed] . . . correction[s] officers to rampage through the . . . Facility, intimidating [and] tramautazing the [Detaionees] with their 'Riot Guns." Id. at 5.

(4) Defendant Milgram is liable to Plaintiffs because she "has supervisory authority over the Dep[artment] of Human Services, Div[ision] of Mental health [and she] knew or should have known about the [illegal] actions that were performed by . . . lower rank subordinates." Id. at 5-6.

(5) Defendants Main and Spagnuolo are liable to Plaintiffs because they did not protect the Detainees fromn the search of the Facility and did not "prevent[] Detainees [from] being provoked, laughed at, intimidated [and] traumatized by the show of force [when the Facility officers] displey[ed] 'Riot Guns,' batons and night sticks." Id. at 6.

## C.    Claims Against "Doe" Defendants

In addition to the foregoing, Plaintiffs assert that the following unidentified defendants are liable to Plaintiffs:

(1)    Defendant John Doe is liable to Plaintiffs because, being a "Regional Commander of Dep[artment] of Corrections,"[11] he "ordered and enforced the removal of [the Detainees] from the [Facility into the recreation yard] to stay out in the [h]ot [s]un." Id. at 4.

(2)    Defendants Jack and Joan Does, each 1 to 40, respectively, corrections officers at the Facility, are liable to Plaintiffs because they "followed the order of [John Doe,] Regional Commander in removing all [the Detainees] from the [Facility] into the rec[reation] yard in an orderly fashion [while] laughing at, intimidating [and] traumatizing [the Detainees] with [display of] 'Riot Guns.'" Id. at 4-5.

(3)    Defendants James and Jane Does, each 1 to 10, respectively, public advocates, are liable to Plaintiffs because they "were informed on numerous occasions of . . . mis-treatment [at the Facility, and] have a blind eye on this subject matter [and] not doing anything [to] stop[] and/or prevent[] such non[]sense from happening." Id. at 7.

---

[11]

It appears that John Doe, a Regional Commander is a fictitious person assigned a fictitious title.

Page 14 of 63

### D.  Relief

Plaintiffs seek the following relief:

(1)  From Defendant Corzine, $25 million, <u>see</u> Compl. at 17;

(2)  From Defendant Hayman, $20 million, <u>see</u> <u>id.</u>;

(3)  From Defendant "John Doe," a fictitious entity, $15 Million, <u>see</u> <u>id.</u>;

(4)  From Defendants Jack Does 1-40, $10 million from each Defendant, <u>i.e.</u>, the total of $400 million, <u>see</u> <u>id.</u>;

(5)  From Defendants Joan Does, 1-40, $10 Million from each Defendant, <u>i.e.</u>, the total of $400 million, <u>see</u> <u>id.</u>;

(6)  From Defendant Goodwin, $15 Million, <u>see</u> <u>id.</u>;

(7)  From Defendant Sweeney, $15 Million, <u>see</u> <u>id.</u>;

(8)  From Defendant Milgram, $20 Million, <u>see</u> <u>id.</u>;

(9)  From Defendant Main, $15 Million, <u>see</u> <u>id.</u>;

(10)  From Defendant Spagnuolo, $15 Million, <u>see</u> <u>id.</u>;

(11)  From Defendants James Does, 1-10, $15 Million from each Defendant, <u>i.e.</u>, the total of $150 million, <u>see</u> <u>id.</u>; and

(12)  From Defendants Jane Does, 1-10, $15 Million from each Defendant, <u>i.e.</u>, the total of $150 million. <u>See</u> <u>id.</u>

Kindly, although incorrectly, performing the arithmetic for the Court's conveniences, Plaintiffs sum the aforesaid monetary remedies into the grand total of $1.04 Trillion,[12] <u>see</u> <u>id.</u>, that is,

---

[12]  Plaintiffs' arithmetic differs from that of the Court.  The
(continued...)

slightly more than one-twelfth of the entire United States' 2006 national domestic product. <u>See</u> Lee Conrad, <u>World Wealth Report</u>, US Banker 10 (August 2007) (stating the amount of US 2006 GDP).

## **STANDARD OF REVIEW**

In determining the sufficiency of a complaint, the Court must be mindful to construe it liberally in favor of the plaintiff. <u>See</u> <u>Haines v. Kerner</u>, 404 U.S. 519 (1972); <u>United States v. Day</u>, 969 F.2d 39, 42 (3d Cir. 1992). The Court should "accept as true all of the allegations in the complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997). The Court need not, however, lend credit to a <u>pro</u> <u>se</u> plaintiff's "bald assertions" or "legal conclusions." <u>Id.</u> Thus, "[a] pro se complaint may be dismissed for failure to state a claim only if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Milhouse v. Carlson</u>, 652 F.2d 371, 373 (3d Cir. 1981) (quoting <u>Haines</u>, 404 U.S. at 520).

---

[12](...continued)
Court's sum of 25, 20, 15, 400, 400, 15, 15, 20, 15, 15, 150 and 150 equals to 1,240, hence totaling Plaintiffs' requested remedy at a modest figure of $1.24 Billion. This arithmetical discrepancy, however, bears none on the legal validity of Plaintiffs' claims. If anything, the amount merely puts a question mark as to the earnestness of Plaintiffs' legal aspirations.

Federal courts are courts of limited jurisdiction. See Mansfield, C. & L. M. R. Co. v. Swan, 111 U.S. 379, 383 (1884). "[T]hey have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." Bender v. Williamsport Area School Dist., 475 U.S. 534, 541 (1986). A district court may exercise jurisdiction over "Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority." U.S. Const. art. III., § 2; see also 28 U.S.C. § 1331. Section 1983 of Title 42 of the United States Code authorizes a person such as Plaintiff to seek redress for a violation of his federal civil rights by a person who was acting under color of state law. Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

To recover under 42 U.S.C. § 1983, a plaintiff must show two elements: (1) a person deprived him or caused him to be deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was done under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); Adickes v. S.H. Kress &

Co., 398 U.S. 144, 152 (1970); Sample v. Diecks, 885 F.2d 1099, 1107 (3d Cir. 1989).

"When evaluating a claim brought under § 1983, we must first 'identify the exact contours of the underlying right said to have been violated' in order to determine 'whether [plaintiff] has alleged a deprivation of a constitutional right at all." Natale v. Camden County Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)). If so, the Court then determines whether the defendant can be held liable for that violation. See Natale, 318 F.3d at 581; Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000).

This Court liberally construes Plaintiff's Complaint as attempting to state two types of Due Process claims, one based on alleged failure of the Facility officials to provide minimally civil conditions of confinement and another based on alleged deliberate indifference to serious medical needs, and a Fourth Amendment claim based on allegedly illegal search of the Facility.


## DISCUSSION

### I.  Liability of Particular Defendants

#### A.  *Respondeat Superior* Liability

It is well established that supervisory liability cannot be imposed under § 1983 on a respondeat superior theory. See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423

U.S. 362 (1976). "'A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior.'" Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown through allegations that a defendant directed, had *actual* knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights. See id.; Monell, 436 U.S. at 694-95 (1978). Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. See Sample v. Diecks, 885 F.2d 1099, 1117-118 (3d Cir. 1989); see also City of Canton v. Harris, 489 U.S. 378 (1989); Heggenmiller v. Edna Mahan Corr. Inst. for Women, No. 04-1786, 128 Fed. Appx. 240 (3d Cir. 2005).

In the case at bar, Plaintiffs allege supervisory liability of Defendants Corzine, Hayman, Goodwin, Sweeney, Milgram, Main and Spagnuolo. However, Plaintiffs' allegations are limited to Plaintiffs' bald assertions that these Defendants "should have known" about the events of August 30, 2007. Such "should have known" allegations do not indicate that these Defendants were personally involved in the events of August 30, 2007 (even if this Court is to hypothesize that the events of August 30, 2007,

included any constitutionally wrongful actions), and thus, fail to state a claim cognizable under § 1983. Therefore, Plaintiffs' claims against Defendants Corzine, Hayman, Goodwin, Sweeney, Milgram, Main and Spagnuolo will be dismissed with prejudice.

### B. Claims Asserting Public Advocates

Moreover, personal involvement by a defendant, an indispensable element of a valid legal claim, may exist only where the named defendant violated the plaintiff's rights either by executing the acts at issue himself or herself, or by directing others to violate the plaintiff's rights. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995). Where no personal involvement by the defendant is asserted, Plaintiff's claim against that defendant is subject to dismissal. See Rode, 845 F.2d at 1207. Since Plaintiffs' allegations against Defendants James/Joan Does, 1 to 10, respectively, are based solely on Plaintiffs' belief that these Defendants "should have known," somehow, about the events of August 30, 2007, in advance, and should have intervened, somehow, with these events, Plaintiffs' allegations fail to indicate that these Defendants had any form of affirmative personal involvement in the matter. Therefore, claims against these Defendants will be dismissed with prejudice.

Plaintiffs' allegations indicate personal involvement of only Defendant John Doe, a fictitious entity, and unidentified Defendants John/Jane Does, corrections officers at the Facility. Consequently, Plaintiffs' allegations will be examined solely with respect to Defendants John/Jane Does, corrections officers.[13]

## II.  **Fourth Amendment Claim**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV.  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).  "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate

---

[13]
The sole fact that Plaintiffs do not know the identities of defendants does not necessarily nullify Plaintiffs' claims.  See Alston v. Parker, 363 F.3d 229, 233 n.6 (3d Cir. 2004) ("Plaintiffs may be unaware of the identities and roles of relevant actors and, owing to their incarceration or institutionalization, unable to conduct a pre-trial investigation to fill in the gaps.  But by itself, this lack of knowledge does not bar entry into a federal court. . . . [P]leading and the liberal discovery rules allow for meritorious claims to proceed even if a confined prisoner cannot adduce all the necessary facts at the outset").

governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose. Id. at 529. The Supreme Court rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530. The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. . . . [S]ociety would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. . . . [I]t is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted). The same conclusion was reached with respect to detainees other than convicted prisoners. See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979) (finding that a body cavity searches of pretrial detainees do not violate the Fourth Amendment).

Given the holding of Hudson and Wolfish, this Court will dismiss Plaintiffs' claims based on the allegedly "illegal" search of the Facility, since Plaintiffs' expectation of privacy yield to the Facility officials' legitimate governmental interests to ensure that the Facility remains free of controlled substances.

Therefore, Plaintiffs' Fourth Amendment claims based on the alleged illegality of search will be dismissed with prejudice.

### III. <u>Due Process Claims</u>

Since "the Due Process rights of a pre-trial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner," <u>Reynolds v. Wagner</u>, 128 F.3d 166, 173 (3d Cir. 1997) (citation omitted); <u>see also</u> <u>Bell</u>, 441 U.S. at 544; <u>City of Revere v. Massachusetts</u>, 463 U.S. 239, 244 (1983), the Eighth Amendment sets forth the floor for the standard applicable to the claims of civilly-committed or pre-trial detainees. <u>See</u> <u>Bell</u>, 441 U.S. at 544. Thus, a failure of prison officials to provide minimally civil conditions of confinement to pre-trial or civilly-committed detainees, or deliberate indifference to a serious medical needs of such detainees, violates their right not to be punished without due process of law. <u>See</u> <u>Reynolds</u>, 128 F.3d at 173-74; <u>Monmouth County Correctional Institution Inmates v. Lanzaro</u>, 834 F.2d 326, 345-46, n.31 (3d Cir. 1987); <u>see also</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976); <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994).

### A. Generic Conditions of Confinement Claims

Analysis of whether a civil detainee has been deprived of liberty without due process is governed by the standards set out by

the Supreme Court in <u>Bell v. Wolfish</u>, 441 U.S. 520 (1979).
<u>Fuentes</u>, 206 F.3d at 341-42.

> In evaluating the constitutionality of conditions or restrictions of [civil] detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. ...

> Not every disability imposed during [civil] detention amounts to "punishment" in the constitutional sense, however. Once the government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. ...

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of [civil] detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees <u>qua</u> detainees. ...

441 U.S. at 535-39 (citations omitted).

The Court further explained that the government has legitimate interests that stem from its need to maintain security and order at the detention facility. "Restraints that are reasonably related to

the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial."  441 U.S. at 540.   Retribution and deterrence, however, are not legitimate nonpunitive governmental objectives.  441 U.S. at 539 n.20.  Nor are grossly exaggerated responses to genuine security considerations.  Id. at 539 n.20, 561-62.

The Third Circuit established a two-part test in line with Bell:

> "we must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes.  In assessing whether the conditions are reasonably related to the assigned purposes, we must further inquire as to whether these conditions "cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purpose assigned to them."

713 F.2d at 992.

In the case at bar, Plaintiffs' conditions of confinement allegations are limited to the fact that Plaintiffs, being among the Detainees of the Facility, spent between three to five hours in the recreation yard.  See Compl. at 10-11 (detailing the hours).

Plaintiffs assert that they were availed to insufficient amount of shaded area during 95 degree heat.  However, the actual temperature on that day in the vicinity of the Facility, at the time the Detainees entered the recreation yard, that is, at 8:35

A.M., was about 72 degrees, and reached about 84.5 degrees by the time the last Detainees returned to the Facility, that is, at 1:25 P.M.; the hottest temperature on August 30, 2007, was about 86 degrees, and was reached around 3 P.M., that is about an hour and a half *after* all the Detainees returned to the Facility.[14]  See <<http://www.almanac.com/weatherhistory/oneday.php?number=724097&wban=99999&day=30&month=8&year=2007&searchtype=zip>>; <<http://www.almanac.com/weatherhistory/oneday.php?number=725020&wban=14734&day=30&month=8&year=2007&searchtype=zip>>.  The mean temperature at the vicinity of the Facility was, on August 30, 2007, 74.9 degrees, while the average humidity reached 61 percent, and western wind varied from 3.5 to 6.9 mph.  See id.  Moreover, while the 210 Detainees were, arguably, availed to the amount of shaded area insufficient to protect them all from sun rays simultaneously, nothing prevented the Detainees, Plaintiffs included, from rotating their stays in the shaded area.  The Court concludes that, being placed in the Facility's recreation yard having a certain amount of shaded area, for three to five hours on a summer morning, when the temperature varied from 72 to 84.5

---

[14]

Rule 201(b), Federal Rules of Evidence permits a district court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Rule 201(b). Under Rule 201(d), Federal Rules of Evidence, a district court must take judicial notice "if requested by a party and supplied with the necessary information." Rule 201(d).

degrees, with 61 percent humidity, no precipitation and mild wind, could not amount to a "hardship over an extended period of time," or to an "adverse conditions . . . excessive in relation to the purpose assigned to them," that is, to the purpose of keeping the Detainees outside the Facility during the Facility-wide search for controlled substances, which ensued from the Facility officials' legitimate security interest in having the Facility free of illegal drugs. Accord Chandler v. Crosby, 379 F.3d 1278 (11th Cir. 2004) (constant high temperatures in prison cells did not violate inmates' constitutional rights where temperature remained between 80 and 86 degrees).

Similarly, Plaintiffs' allegations that the initial servings of water were in amounts less than Plaintiffs desired, or that the re-servings of water were not as frequents as Plaintiffs wished, and that the water was not chilled to meet Plaintiffs' preferences, do not state a viable deprivation claim in view of the fact that Plaintiffs *were actually* served water at repeated intervals, and even if the ration was limited, the limitation continued for three to five hours only.[15] See Compl. at 10-11.

---

[15] Plaintiffs' allegations as to denial of access to bathrooms for five minutes or as to denial of showers for ten minutes does not even merit a discussion. Where a civil detainee is completely denied usage of the toilet *over the period of many hours*, such denial *might* give rise to a constitutional violation. See, e.g., Campbell v. City of Bakersfield, 2006 U.S. Dist. LEXIS 49930 (E.D. Cal. July 21, 2006) (complete prohibition on usage of the toilet by
(continued...)

Finally, nothing in the Complaint suggests that the Facility officials knew of and disregarded any excessive risk to health and safety of the Detainees when they placed the Detainees in the recreation yard on August 30, 2007. See Farmer, 511 U.S. at 837 (1994). Moreover, Plaintiffs' conclusion that being placed for three to five hours in the recreation yard amounted to "criminal negligence," see Compl. at 13, cannot salvage Plaintiffs' claims, since negligence is not actionable under § 1983.[16] See Wilson, 501

_____

[15](...continued)
a civil detainee over the period of *nine hours might* amount to a potential constitutional violation); Wine v. Dep't of Corr., 2000 U.S. Dist. LEXIS 22555 (W.D. Wis. Dec. 27, 2000) (finding a potential constitutional violation where detainees were placed on a bus and shackled to one another, and were allowed to use the toilet only twice during a 32-hour trip, and such limitation caused the inmates to urinate and defecate on themselves, and to become sick as a result of overflowed urine and feces running on the floor where inmates and soiling their feet, shoes and pants). By contrast, if denial of access to the toilet lasts a few hours or is not a "complete" denial, such denial cannot supply sufficient grounds to support a constitutional claim. See Heitschmidt v. City of Houston, 161 F.3d 834, 837-38 (5th Cir. 1998) (complete prohibition on usage of the toilet by a civil detainee cannot amount to a constitutional violation if it lasts only four hours); accord Alexander v. Tippah County, Mississippi, 351 F.3d 626 (5th Cir. 2003) (placement, for twenty-four hours, in a cell that had no running water nor toilet facilities other than a grate-covered hole in the floor, and the feces obstructed the hole and caused the urine to splatter onto the floor causing the inmates nausea and vomiting, does not sustain an injury sufficient to trigger the protection of the Constitution).

[16]
Plaintiffs' use of the qualifier "criminal" in the phrase "criminal negligence" is of no import for purposes of the civil case at hand. Moreover, if Plaintiffs' use of the word "criminal" is to be interpreted as Plaintiffs' intention to initiate a criminal prosecution, Plaintiffs' interest in such criminal prosecution is of no legal relevance. A private plaintiff cannot
(continued...)

U.S. at 305.  Allegations of negligence or errors in professional judgment are insufficient to sustain a constitutional claim.  Cf. Zimmerman v. Macomber, 2001 U.S. Dist. LEXIS 12499 (S.D.N.Y. Aug. 21, 2001).

Consequently, Plaintiffs' generic due process claims based on conditions of confinement will be dismissed with prejudice.[17]

---

[16](...continued)
force a criminal prosecution because the "authority to initiate a criminal complaint rests exclusively with state and federal prosecutors."  See Collyer v. Darling, 98 F.3d 211, 222 (6th Cir. 1996); see United States v. Jarvis, 560 F.2d 494, 497 (2d Cir. 1977); Pokalsky v. SEPTA, 2002 U.S. Dist. LEXIS 16175 (E.D. Pa. Aug. 28, 2002); Forney v. Woodridge Hosp. & Johnson City Med. Ctr., 2005 U.S. Dist. LEXIS 37257, at *6 (E.D. Tenn. Sept. 14, 2005); see also United States ex rel. Savage v. Arnold, 403 F. Supp. 172 (E.D. Pa. 1975) (stating that a private party cannot, on his own, commence a criminal proceeding); United States ex rel. Spader v. Wilentz, 25 F.R.D. 492 (D.N.J), aff'd, 280 F.2d 422 (3d Cir.), cert. denied 364 U.S. 875 (1960)).

> It is well established that private citizens can neither bring a direct criminal action against another person *nor* can they petition the federal courts to compel the criminal prosecution of another person.  See Maine v. Taylor, 477 U.S. 131, 137 (1986); Heckler v. Chaney, 470 U.S. 821, 832 (1985); Leeke v. Timmerman, 454 U.S. 83, 86-87 (1981); United States v. General Dynamics Corp., 828 F.2d 1356, 1366 (9th Cir. 1987).

Ellen v. Stamm, 1991 U.S. App. LEXIS 30558 (9th Cir. Dec. 19, 1991) (emphasis supplied), cert. denied, Montalvo v. Stamm, 506 U.S. 1047 (1993).

[17]
The Complaint indicates that certain Detainees, which might or might not included Plaintiffs, were actually prevented from putting on clothes (other than their underwear) or taking their hats when they were being removed to the recreation yard.  See Compl. at 14. The Complaint, however, is silent as to the identities of the Detainees who were prevented from clothing themselves or taking their hats, as well as to the actual language, actions and other

(continued...)

**B.    Verbal/Visual Harassment Claims**

Acts of verbal harassment cannot qualify as violations of an inmate's constitutional rights. See Stepney v. Gilliard, 2005 U.S. Dist. LEXIS 31889, at *19 (N.J.D. Dec. 8, 2005) ("[V]erbal harassment and taunting is neither 'sufficiently serious' nor 'an unnecessary and wanton infliction of pain' under the common meaning of those terms. 'Verbal harassment or profanity alone . . . no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under [Section] 1983") (quoting Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998), and citing Collins v. Graham, 377 F. Supp. 2d 241, 244 (D. Me. 2005)); see also Robinson v. Taylor, 2005 U.S. Dist. LEXIS 20951, at *8-9 (D. Del. Sept. 26, 2005) ("[M]ere verbal harassment does not give rise to a constitutional violation[; even if it is] inexcusable and offensive, [it] do[es] not establish liability under section 1983) (quoting McBride v. Deer, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) and citing Moore v. Morris, 116 Fed. App'x 203, 205 (10th Cir. 2004); Freeman v. Arpaio, 125 F.3d 732, 738

---

[17](...continued)
circumstances of the alleged preventive measures.  See generally, Compl.  The Court, therefore, will dismiss the Complaint *without* prejudice to submission of amended complaints by individual Plaintiffs, if any, who were actually prevented from clothing themselves or taking their hats and, consequently, suffered a medical condition, provided that such amended complaints would detail the exact language, actions and other circumstances of the alleged preventive measures.

(9th Cir. 1997); <u>Collins v. Cundy</u>, 603 F.2d 825, 827 (10th Cir. 1979)); <u>Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185,</u> 187-89 (D.N.J. 1993)); <u>Abuhouran v. Acker</u>, 2005 U.S. Dist. LEXIS 12864, at *15 (E.D. Pa. June 29, 2005) ("It is well established . . . that . . . verbal harassment, . . . standing alone, do[es] not state a constitutional claim") (citing <u>Dewalt v. Carter</u>, 224 F.3d 607, 612 (7th Cir. 1999); <u>Williams v. Bramer</u>, 180 F.3d 699, 706 (5th Cir. 1999); <u>Maclean v. Secor</u>, 876 F. Supp. 695, 698 (E.D. Pa. 1995)); <u>Collins v. Cundy</u>, 603 F.2d 825 (10th Cir. 1979) (dismissing prisoner's claim that defendant laughed at prisoner and threatened to hang him).

Since the alleged verbal harassment of Plaintiffs, as well as the alleged "brandishing of 'Riot Guns'" were not accompanied by any injurious actions--or physical actions of any kind--by the Facility officials, Plaintiffs' allegations fail to state a cognizable §1983 claim: it would be unreasonable for Plaintiffs, after being placed in care of corrections officers, to expect the officers not to carry weapons for legitimate security purposes, same as it would be anomalous for this Court to allow Plaintiffs to use the United States Constitution as a general code of civility mandating subtle psychological sensitivities by corrections officials. <u>Accord</u> <u>Faragher v. City of Boca Raton</u>, 118 S. Ct. 2275, 2283-84 (1998).

### C.   Medical Claims

Conditions of confinement, which involve an unnecessary and wanton infliction of pain, amount to a violation of a pre-trial or involuntarily civilly-committed detainee's constitutional rights. Accord Rhodes, 452 U.S. at 346, 347. However, the definition of "unnecessary and wanton infliction of pain" is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." Id. at 346 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).

Thus, to prevail on a medical care claim, a detainee must show that the defendants were deliberately indifferent to his/her serious medical needs. See Estelle v. Gamble, 429 U.S. 97; Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). Persistent severe pain qualifies as a serious medical need. A medical need is also serious where it "has been diagnosed by a physician as requiring treatment or is . . . so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

"Deliberate indifference" exists "where [a] prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse,

182 F.3d at 197; <u>Durmer v. O'Carroll</u>, 991 F.2d 64 (3d Cir. 1993).
Deliberate indifference is also evident where officials erect
arbitrary and burdensome procedures that result in interminable
delays and denials of medical care to suffering inmates. <u>See</u>
<u>Monmouth County Correctional Institution Inmates v. Lanzaro</u>, 834
F.2d 326, 346-47 (3d Cir. 1987), <u>cert. denied</u> 486 U.S. 1006 (1998).
However, neither inconsistencies or differences in medical
diagnoses, nor refusal to consider inmate's self-diagnoses, to
summon the medical specialist of the inmate's choice, to perform
tests or procedures that the inmate desires, to explain to the
inmate the reason for medical action or inaction, or to train the
inmate to perform medical procedures can amount to cruel and
unusual punishment. <u>See</u> <u>White v. Napoleon</u>, 897 F.2d 103 (3d Cir.
1990) (mere disagreements over medical judgment do not state Eighth
Amendment claims).

In the case at bar, it appears undisputed that all ailments
and/or medical conditions experienced by Plaintiffs during the
August 30, 2007, events were immediately attended by the Facility's
corrections officials and, on certain instances, corrections
officials together with the Facility's nurse. <u>See</u> Compl. at 10-13.
Therefore, the Complaint does not indicate that the Facility's
corrections officers and the nurse were deliberately indifferent to
the Detainees' medical needs during the time when the Detainees
were in the recreation yard (even if the attention provided was

imperfect or negligent, since medical negligence does not become a constitutional violation merely because the victim is in confinement). See Estelle, 429 U.S. at 106. Hence, for these reason, the Complaint fails to state a claim against the corrections officers.[18]

Moreover, the "serious medical need" aspect differs with respect to different Plaintiffs.

It appears apparent that Plaintiffs Banda and Marino (a) did not experience a "severe medical need," since their "ailments" were limited to puffy eyes and/or sunburn on forehead and nose so mild that these Plaintiffs elected to wait three days prior to contacting a medical doctor at the Facility.[19] See id. at 13. Plaintiffs Banda and Marino's speculation that they might, at some point, develop skin cancer does not convert their "ailments" into a serious medical need, since Defendants could only be held deliberately indifferent only to an existing serious medical

---

[18] The Complaint indicates prompt actions by the corrections officers also after the Detainees returned to the Facility. See Compl. at 10-13. The Complaint is, however, silent as to the actions of the nurse when the Detainees, after returning to the Facility, were "taken"--or went--to see the nurse, hence preventing the Court from making an intelligible assessment of these events.

[19] Moreover, the "ailments" of Defendants Banda and Marino were immediately treated, since the doctor prescribed medication that, apparently, cured these "ailments." See Compl. at 13. Hence, the medical need claims of Defendants Banda and Marino fail to satisfy both prongs of the test.

condition, not a speculative future medical injury.  See Patterson
v. Lilley, 2003 U.S. Dist. LEXIS 11097 (S.D.N.Y. June 20, 2003).

Furthermore, according to the Complaint, Plaintiffs Harrell,
Bagarozy, Creveling, Sanchez and Delstritta experienced *no* medical
need of any kind.  See generally, Compl.  Therefore, allegations
of these Plaintiffs, as well as Plaintiffs Banda and Marino fail to
state a cognizable § 1983 claim and will be dismissed with
prejudice.

However, the Complaint is not clear as to the medical needs,
and treatment of those needs by the Facility's medical personnel
(or the hospital personnel), with respect to other Plaintiffs.
While it appears that these other Plaintiffs were availed to
immediate attention by the corrections officials when these other
Plaintiffs developed their ailments and/or medical conditions, the
Complaint fails to specify whether: (a) Plaintiffs Quick,
Conkright, Conn, Walker and Salerno actually obtained any medical
treatment when they contacted the Facility's nurse; (b) Plaintiffs
Haines and Rodriguez' secondary occurrences of their medical
conditions were caused by the nurse's failure to provide Plaintiffs
Haines and Rodriguez with any treatment during their initial
medical conditions (or by unjustified undue delays in medical
services); (c) Plaintiff Howard and Williams obtained any medical
treatment at the hospital where they were taken.  See generally,
Compl.  Thus, the Complaint will be dismissed without prejudice

with respect to Plaintiffs Howard, Williams, Haines, Rodriguez, Quick, Conkright, Conn, Walker and Salerno, since leave to amend would warranted as to these Plaintiffs because, these Plaintiffs might actually have valid claims and be able to cure the currently existing deficiencies of their claims.

## IV.  Certification of Plaintiffs' Putative Class Is Unwarranted

### A.  General Considerations

There are general considerations cautioning against class certification of detainees.  It is well known that group applications are rife with potential problems.  See, e.g., Lindell v. Litscher, 212 F. Supp. 2d 936  (W.D. Wis. Mar. 8, 2004).

> The court has only limited ability to monitor the prosecution of the complaint to insure, for example, that each plaintiff receives a copy of each document or pleading submitted to the court and approves the submission or that each plaintiff is capable of understanding the submissions made on his behalf.  In this case, it is extremely unlikely that each [plaintiff] has seen a copy of the group complaint, considering its length and the expense that photocopying it would have involved.  This makes it impossible to know whether each plaintiff even knows what is being advanced on his behalf.  In these circumstances, there is no way to protect the interests of each plaintiff. . . . It is rare, however, that all of the claims in any complaint are common to every one of the named [plaintiffs].  The complaint in this case is an example of such a pleading.  Petitioners allege several claims concerning the physical conditions at the . . . Facility that are common to each of them, but only [one] petitioner . . . alleges that he was deprived of his [equal protection rights]. Requiring separate complaints encourages each [plaintiff] to limit his complaint to the claims that are specific to him.  The effect is conservation of judicial resources.

Boriboune v. Berge, 2004 U.S. Dist. LEXIS 3926, at *4-7 (W.D. Wis. Mar. 8, 2004), remanded on other grounds, Boriboune v. Berge, 60 Fed. R. Serv. 3d (Callaghan) 417 (7th Cir. Wis. 2004) (finding that there was no irreconcilable conflict between Rule 20 and 28 U.S.C. § 1915 of the PLRA); accord Boriboune v. Berge, 2005 U.S. Dist. LEXIS 1165 (W.D. Wis. Jan. 12, 2005) (advising each of the inmates that they would be held legally responsible for knowing precisely what was being filed in the case on their behalf and would be subject to sanctions under Fed. R. Civ. P. 11 if such sanctions were found warranted in any aspect of the case); see also Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. N.C. 1975) (class actions by prisoners are impractical since each plaintiff must be notified separately of court documents, orders, and deadlines); Wasko v. Allen County Jail, 2006 U.S. Dist. LEXIS 22907 (N.D. Ind. April 12, 2006) (finding impracticalities inherent to multi-prisoner litigation); Swenson v. MacDonald, 2006 U.S. Dist. LEXIS 5784 (D. Mont. Jan. 30, 2006) (same); Thomas E. Willging, Laural L. Hooper, Robert J. Niemic, Class Actions and the Rulemaking Process: An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges, 71 N.Y.U.L. Rev. 74, 96 (May 1996) (assessing "the average amount of time required for the average class actions" and concluding that "class actions required [for a resolution of] prisoner civil rights cases" filed as a class action is 5.03 times more than the time

required for resolution of all claims of individual members of the class).

Next, the Court should certify a class of inmates with caution being mindful of the fact that it is all too easy for one inmate with some purported knowledge of the law to persuade others to join a complaint, whether or not it is in the best interests of the others to do so. See Swenson, 2006 U.S. Dist. LEXIS 5784, at *5-6.

In addition to these reasons, there are other considerations cautioning against certification of Plaintiffs' putative class. For instance, none of Plaintiffs could act as a "lead plaintiff" since it was long established that "a prisoner proceeding pro se may not seek relief on behalf of his fellow inmates." Alexander v. New Jersey State Parole Board, 160 Fed. Appx. 249, 249 n.1 (3d Cir. 2005) (citing Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir. 1975) ("it is plain error to permit [an] imprisoned litigant . . . to represent his fellow inmates in a class action")). The rationale for this prohibition is derivative from the language of Rule 23(a)(4) which requires that the class representative have the capacity to fairly and adequately protect interests of class members, and an inmate, a lay person subject to being transferred to another corrections facility at any time, cannot, by definition, adequately and fairly represent other incarcerated individuals. See Awala v. N.J. Dep't of Corr., 2005 U.S. Dist. LEXIS 18426 (D.N.J. Aug. 23, 2005), appeal dismissed, 2007 U.S. App. LEXIS 2094

(3d Cir. Jan. 31, 2007); <u>see also</u> <u>Laird v. Tatum</u>, 408 U.S. 1 (1972); <u>Valley Forge Christian College v. Americans United for Separation of Church & State</u>, 454 U.S. 464, 482 (1982); <u>Hummer v. Dalton</u>, 657 F.2d 621, 625-26 (4th Cir. 1981) (a prisoner cannot act as a "knight-errant" for others); <u>accord</u> <u>McNeil v. Guthrie</u>, 945 F.2d 1163, 1164 & nn.1-2 (10th Cir. 1991) (a prisoner lacks standing to raise any claims of others regarding the class action); <u>accord</u> <u>Booker v. Powers</u>, 2007 U.S. Dist. LEXIS 12349, at *5 (E.D. Cal. Feb. 8, 2007) (same); <u>accord Ray v. Robertson</u>, 05-2904 (S. Car. Dec. 21, 2005) (R. Bryan Harwell, J.) (discussing non-certificability of a prisoners' class ridden with the problems analogous to those present in Plaintiffs' putative class).

Finally, this Court is deeply concerned with Plaintiffs' indication that Plaintiffs reject, in the event the class is certified and prevails on the issue of liability, separate trials in order to allocate damages. <u>See</u> Compl. at 18 (indicating that the award, if any, would be "shared equally among the . . . Plaintiffs [and] the rest of the [Detainees]"). Plaintiffs cannot contract among themselves as to what causes of action provide grounds to monetary damages, same as they cannot decide how to divvy the monies obtained as a legal remedy. Section 1983 of Title 42, under which the Complaint has been submitted, does allow for an award of damages, but *only* for those causes and *only* to those plaintiffs and *only* in such amount as a jury or other trier of fact

may reasonably find, based on the evidence.  See, e.g., Memphis Community School Dist. v. Stachura, 477 U.S. 299; Webb v. City of Chester, 813 F.2d 824, 836 (7th Cir. 1987); accord Steering Comm. v. Exxon Mobil Corp., 461 F.3d 598 (5th Cir. 2006)(a formulaic distributory scheme could be chosen solely by the trier of fact on the basis of evidence determined credible by the trier of fact); Transkaryotic Therapies, Inc. Sec. Litig., 2005 U.S. Dist. LEXIS 29656 (D. Mass. Nov. 28, 2005) (same).

### B.    The Putative Class Provides No Basis for Certification

A party seeking class certification bears the burden of proving that the proposed class action satisfies the requirements of Federal Rule of Civil Procedure 23.  See Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 183-84 (3d Cir. 2001).  To meet this burden, Plaintiffs must satisfy the four prerequisites of Rule 23(a) and show that the action can be maintained under at least one of the subsections of Rule 23(b). See id.; see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997).  The Court of Appeals for the Third Circuit has recognized the utility, and often the necessity, of looking beyond the pleadings at the class certification state of litigation.  See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 168-69 (2001) ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the

alleged claims can be properly resolved as a class action"). Despite that review, "it is not necessary for the plaintiffs to establish the merits of their case at the class certification stage" and "the substantive allegations of the complaint must be taken as true." <u>Chiang v. Veneman</u>, 385 F.3d 256, 262 (3d Cir. 2004).

To be certified as a class, plaintiffs must satisfy Federal Rule of Civil Procedure 23(a).

Rule 23(a) provides as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Commonly referred to as numerosity, commonality, typicality, and adequate representation, these four requirements are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." <u>Baby Neal v. Casey</u>, 43 F.3d 48, 55 (3d Cir. 1994).

Both size of class and complexity of litigation should be limited to encourage manageability of class suits. Rule 23(c)(4) permits division of any action into subclasses so as to increase manageability. <u>See</u> <u>Dore v. Kleppe</u>, 522 F.2d 1369, <u>reh'g denied</u>, 526 F.2d 697 (5th Cir. 1975). Rule 23(c)(4) provides that, if "a

class [is] divided into subclasses[,] . . . each subclass [is] treated as a class." Therefore, "[a]ny subclass formed must itself meet all requirements of class action," Avery v. Heckler, 584 F. Supp. 312 (D. Mass. 1984); see also De Gidio v. Perpich, 612 F. Supp. 1383 (D. Minn. 1985), and even if subclassification is appropriate, subclasses cannot be certified unless the party seeking certification can demonstrate that requirements of Rule 23 are established. See Pickett v. IBP, Inc., 197 F.R.D. 510 (M.D. Ala. 2000).

Here, the Court is notified of one putative class and, on its own, envisions three sub-classes: (a) the class consisting of all sixteen Plaintiffs (hereinafter "Class"); (b) a sub-class consisting of Plaintiffs that endured no serious medical need, i.e., Plaintiffs Harrell, Bagarozy, Creveling, Sanchez, Delstritta, Banda and Marino (hereinafter "Unqualified Sub-Class");[20] (c) a sub-class consisting of seven Plaintiffs who, allegedly, experienced a certain medical need of unstated seriousness and sought to obtain treatment at the Facility, i.e., Plaintiffs Haines, Rodriguez, Quick, Conkright, Conn, Walker and Salerno (hereinafter "Facility Sub-Class"); and (d) a sub-class consisting

---

[20] Grounds for denial of certification to the Unqualified Sub-Class will not be detailed in the instant Opinion in view of the fact that, even if the Unqualified Sub-Class were to meet the requirements of Rule 23, lack of a cognizable claim by the Unqualified Sub-Class makes the inquiry purely academic and a waste of this Court's effort.

of two Plaintiffs who, allegedly, experienced a serious medical need and sought to obtain treatment at the hospital, i.e., Plaintiffs Howard and Williams (hereinafter "Hospital Sub-Class").

### 1. *Numerosity*

Numerosity is the first prerequisite listed in Rule 23(a). "Numerosity requires a finding that the putative class is so numerous that joinder of all members is impracticable." Newton, 259 F.3d at 182; Fed. R. Civ. P. 23(a)(1). "No single magic number exists satisfying the numerosity requirement." Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D. Pa. 1989). The Court of Appeals, however, generally has approved classes of thirty-five/forty or more. See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). In the instant case, Plaintiff's Class of sixteen does not satisfy the numerosity requirement.[21] Analogously, the Facility Sub-Class of seven Plaintiffs fails to meet the numerosity requirement[22]

---

[21]

While Plaintiffs, apparently, intend to share their legal remedy, if any, with all the Detainees at the Facility, see Compl. at 18, the Complaint does not state that any other Detainee is a member of the class or suffered any injury. See generally, Compl.

[22]

The Court, however, notes that, in the event Plaintiffs in the Facility Sub-Class file amended complaints stating claims warranting proceeding of these amended complaints past the sua sponte dismissal state, these amended complaints might be consolidated, for the Court's efficient administration, into a single matter.

Needless to say, certification of the Hospital Sub-Class of two Plaintiffs would make a mockery of the numerosity requirement.

Therefore, the Court concludes that Plaintiffs' putative class and potential sub-classes fail to meet the numerosity requirement and warrant denial of certification.

### 2. *Commonality*

The next Rule 23(a) prerequisite is commonality. To satisfy the commonality requirement, Plaintiffs must show the existence of at least one question of law or fact common to the class. See Johnston v. HBO Film Mgmt., 265 F.3d 178, 184 (3d Cir. 2001).

"Commonality does not require an identity of claims or facts among class members; instead, the commonality requirement will be satisfied if the named plaintiffs share at least one common question of fact and law with the grievances of the prospective class." Id. (quoting In re the Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 310 (3d Cir. 1998) (internal quotations omitted)). "All that is required is that the litigation involve some common questions and that plaintiffs allege harm under the same legal theory." Baby Neal, 43 F.3d at 58. "Because the requirement may be satisfied by a single common issue, it is easily met . . . ." Baby Neal, 43 F.3d at 56. It is not necessary that all putative class members share identical claims. See Hassine v. Jeffes, 846 F.2d 169, 176-177 (3d Cir. 1988). "Even where

Page 44 of 63

individual facts and circumstances do become important to the resolution, class treatment is not precluded." Baby Neal, 43 F.3d at 57.

Since the medical deprivation claims of the Facility Sub-Class, if stated so to amount to claims cognizable under § 1983, might be related to medical treatment by the nurse at the Facility--same as potential claims of Plaintiffs Howard and Williams related to the treatment provided by the hospital where these two Plaintiffs were taken--this Court finds that the commonality requirement is met as to the Facility Sub-Class and the Hospital Sub-Class.[23]

This prerequisite is, however, not met as to the Class since those members of the Class, who are not included in either Sub-Class, have no claim whatsoever and, thus prevent fulfillment of the commonality-of-claims requirement.

### 3. *Typicality*

Rule 23(a)(3) provides that the typicality requirement is satisfied if the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ.

---

[23] Analogously, claims of those Plaintiffs in the Facility Sub-Class or Hospital Sub-Class that relate to medical conditions ensuing from the actions of Defendants Jack/Joan Does preventing these Plaintiffs from clothing themselves or using their hats while reasonably expecting that direct exposure to the sun might cause medical injury to such Plaintiffs meet the commonality requirement.

P. 23(a)(3). The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work for the benefit of the entire class through the pursuit of their own goals. See In re Prudential Ins. Company of America, 148 F.3d 283, 311 (3d Cir. 1998). The typicality test is not overly demanding. See O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 289 (E.D. Pa. 2003). The typicality requirement may be met despite the existence of factual differences between the claims of the named plaintiffs and the claims of the proposed class. See Eisenberg, 766 F.2d at 786. If "the class representatives . . . present those common issues of law and fact that justify class treatment, thereby tending to assure that the absent class members will be adequately represented," then Rule 23(a)(3) is satisfied. Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 923 (3d Cir. 1992) (quoting Eisenberg, 766 F.2d at 786). "Factual differences will not render a claim atypical if the claim arises from the *same event or course of conduct* that gives rise to the class of the class members, and if it is based upon the same legal theory." Id. at 923.

However, in the case at bar, the typicality of claims and defenses does not appear to be present with respect to either (a) the Class (encompassing Plaintiffs who experienced no medical condition of any kind); or (b) the Sub-Classes (in view of dramatic difference between the alleged ailments and/or medical conditions,

i.e., "mild hear attack," "seizure," clinical death, etc., as well as the entities treating these conditions, i.e., the Facility's nurse, Facility's doctor(s), ambulance personnel, hospital personnel, potential outside physicians, etc.) and, thus, defenses related to the claims, which might be stated by the members of these Sub-Classes. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Rhodes v. Chapman, 452 U.S. 337, 349 (1981); White v. Napoleon, 897 F.2d 103 (3d Cir. 1990).

Therefore, this Court finds that the typicality prerequisite is not satisfied by Plaintiffs' application with respect to either the Class or any of the Sub-Classes. See Beck v. Maximus, Inc., 457 F.3d 291, 300 (3d Cir 2006) (noting that "class certification [is defeated upon showing of] some degree of likelihood [that] a unique defense will play a significant role at trial").

### 4. *Adequacy of Representation*

Rule 23 requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). However, where the class includes members with divergent interests because the time of class membership is a factor, the representatives may not adequately represent the class. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 449 (3d Cir. 1977); Miller v. Hygrade Food Prods. Corp., 198 F.R.D. 638 (E.D. Pa. 2001); see also Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239 (3d

Cir. 1975). In the instant case, the representative parties, if any is selected/approved among Plaintiffs, might be--or anticipate being--released from the Facility in the nearest future, while the remaining members of the putative Class or Sub-Classes might face prolonged stays in the Facility.[24] Therefore, the interests of the former may substantially diverge from those of the latter. Consequently, this Court finds that this representational adequacy prerequisite is not met by Plaintiffs' putative Class or Sub-Classes.

### 5.    Rule 23(b) Requirement

In addition to satisfying Rule 23(a), Plaintiffs must also show that the putative Class or Sub-Class falls under at least one of the three subsections of Rule 23(b). Moreover, since Plaintiffs' putative Class/Sub-Classes seek(s) money damages, the Class/Sub-Class must satisfy the requirements of Rule 23(b)(3) regarding the issues of predominance and superiority.[25] See Grider v. Keystone Health Plan Cent., Inc., 2006 U.S. Dist. LEXIS 93085,

---

[24]

For instance, Plaintiff Williams notified this Court that Plaintiff Williams was released from his civil confinement. See Docket Entry No. 2.

[25]

Class action is less favored where plaintiffs seek monetary damages, because any award of damages requires case-by-case examination of individual claims, a process best suited to individual adjudications rather than class action lawsuits. See Contawe v. Crescent Heights of Am., Inc., 2004 U.S. Dist. LEXIS 25746 (E.D. Pa. Dec. 21, 2004).

at *36 (E.D. Pa. Dec. 21, 2006).  This requirement reads as follows:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition[,] the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

The Rule 23(b)(3) requirement that common issues predominate ensures that a proposed class is "sufficiently cohesive to warrant certification." Newton, 259 F.3d at 187.  The predominance requirement of Rule 23(b) is more rigorous than the commonality requirement of Rule 23(a).  See McMahon Books, Inc. v. Willow Grove Assocs., 108 F.R.D. 32, 35 (E.D. Pa. 1985).  The Supreme Court has held that, while "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud[, certification of a class should be made with] caution where individual stakes are high and disparities among class members great." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997) (holding that, although a proposed class of asbestos plaintiffs shared the goal of reaching a settlement, the commonalities did not predominate over individual questions of causation regarding each plaintiff's degree of asbestos exposure under different conditions, pre-existing medical conditions, and tobacco use); see also Windham v. Am. Brands, Inc., 565 F.2d 59, 68 (4th Cir. 1977) ("[W]here the issue of damages and

impact . . . requires separate minitrials . . . courts have found that the staggering problems of logistics thus created make the damage aspect of the case predominate, and render the case unmanageable as a class action") (internal citations omitted). In addition, the requirement that a class action be the superior method of resolving the claims ensures that there is no other available method of handling it which has greater practical advantages. <u>See</u> Fed. R. Civ. P. 23, Advisory Committee Note, 1966 Amendment to 23(b)(3); <u>Johnston</u>, 265 F.3d at 194 ("A class action must represent the best available method for the fair and efficient adjudication of the controversy").  "Superiority must be looked at from the point of view (1) of the judicial system, (2) of the potential class members, (3) of the present plaintiff, (4) of the attorneys for the litigants, (5) of the public at large, and (6) of the defendant. . . . Superiority must also be looked at from the point of view of the issues."  <u>Katz v. Carte Blanche Corp.</u>, 496 F.2d 747, 760 (3d Cir. 1974).

Here, this Court finds that neither the requirement of predominance nor that of superiority could be met with respect to the putative Class or Sub-Classes, in view of qualitative and quantitative differences in corresponding potential defenses, and also in view of the uniqueness of certain injuries allegedly suffered by some Plaintiffs since--if the claims of any Plaintiff is to proceed past <u>sua</u> <u>sponte</u> dismissal stage--the resolution of

the bulk of the matters raised by each Plaintiff of the putative
Class/Sub-Class would require its own mini-trial at both the
liability and damages stages.

Therefore, certification of Plaintiffs' putative Class/Sub-
Classes is improper in view of Plaintiffs' failure to meet the
numerosity, typicality, adequacy, predominance and superiority
requirements. Consequently, certification of Plaintiffs' putative
Class, or any Sub-Class, will be denied.


**V.   Limitation on Future Filing by Plaintiff Banda**

It is well within the broad scope of the All Writs Act, 28
U.S.C. § 1651(a), for a district court to issue an order
restricting the filing of meritless cases by a litigant whose
manifold complaints aim to subject defendants to unwarranted
harassment, and raise concern for maintaining order in the court's
dockets. See e.g., In Re Oliver, 682 F.2d 443, 445 (3d Cir. 1982)
(citing Lacks v. Fahmi, 623 F.2d 254 (2d Cir. 1980) (per curiam);
Harrelson v. United States, 613 F.2d 114, 115 (5th Cir. 1980) (per
curiam); Clinton v. United States, 297 F.2d 899, 901 (9th Cir.
1961), cert. denied, 369 U.S. 856 (1962)).

The Court of Appeals for the Third Circuit guided that,

> [i]n appropriate circumstances, courts have gone beyond
> prohibitions against relitigation and enjoined persons
> from filing any further claims of any sort without the
> permission of the court. In Rudnicki v. McCormack, 210
> F. Supp. 905 (D. Mass. 1962), the court entered such an
> injunction after it found that, in the absence of a

court-ordered proscription, a plaintiff who had "repeatedly filed groundless actions" against various state and federal officers will continue to institute groundless and purely vexatious litigation both against these defendants and against other judges and public officials, the effect of which will be to cause further harassment of these officials, further expense to the governments which they represent, and further burden upon the offices of the clerks of the courts in which such proceedings are initiated. Id. at 911. See also Gordon v. U.S. Department of Justice, 558 F.2d 618 (1st Cir. 1977) (plaintiff enjoined from instituting suit against any state or federal judge, officer, or employee without permission of court); Green v. Wyrick, 428 F. Supp. 732 (W.D. Mo. 1976).

Oliver, 682 F.2d at 445.

Plaintiff Banda enjoyed a substantial legal history in this District. In addition to nine § 1983 actions, which preceded the instant matter and were filed with the frequency of about two actions per year, see this Opinion, note 1, Plaintiff Banda also filed an action under 28 U.S.C. § 1331, identical in its nature to an action filed pursuant to Section 1983, see Banda v. Barfield, Civil Action No. 00-01851 (JHR), and had all these actions dismissed, either summarily or on his stipulation, or upon defendants' motion for summary judgement, with appeals, applications for certiorari and applications for rehearing denied. See id.; see also this Opinion, note 1; see, e.g., Banda v. New Jersey, 134 Fed. Appx. 529 (3d Cir.), cert. denied, 546 U.S. 988 (2005); Banda v. N.J. Dep't of Mental Health Servs., 160 Fed. Appx. 270, (3d Cir. 2006) (dismissing the appeal as legally frivolous); Banda v. N.J. Special Treatment Unit Annex, 164 Fed. Appx. 286 (3d

Cir.), <u>cert. denied</u>, 126 S. Ct. 2373, <u>reh'g denied</u>, 127 S. Ct. 376 (2006).

In sum, it appears that Plaintiff Banda used his imprisonment and civil confinement to entertain himself through drafting voluminous legal submissions bearing a vague appearance of legal documents but having no merit. Hence, Plaintiff Banda is not merely one of the "litigation engines" in the instant action: he is a "recreational litigant," <u>i.e.</u>, the "one who engages in litigation as sport and files numerous complaints with little regard for substantive law or court rules."[26] <u>Jones v. Warden of the Stateville Correctional Ctr.</u>, 918 F. Supp. 1142, 1533 (N.D. Ill. 1995) (following the model utilized by the Court of Appeals for the Third Circuit, noting that, "[w]hen confronted with [a] recreational plaintiff, courts, to protect themselves and other litigants, have enjoined the filing of further case without leave of court," and citing <u>In re Winslow</u>, 17 F.3d 314 (10th Cir. 1994); <u>In re Burnley</u>, 988 F.2d 1 (4th Cir. 1992); and <u>Mayfield v. Collins</u>, 918 F.2d 560 (5th Cir. 1990)). This impression that Plaintiff Banda is a recreational litigant is particularly supported by (a) the fact that, while certain Detainees were, allegedly, removed into the recreation yard in their underwear and suffered medical

---

[26]

While the Court docket indicates that about half of Plaintiffs in this action also previously instituted other <u>pro se</u> civil rights matters in this District, the record of no other Plaintiff involved in the instant case reveals a passion for recreational <u>pro se</u> civil rights litigation remotely comparable to that of Plaintiff Banda.

emergencies, Plaintiff Banda arranged to supply himself with writing material and began taking painstaking up-to-the-minute notes of the events right from the moment when the first Facility corrections officer appeared in the Facility at 8:25 A.M. (_i.e.,_ before the Detainees were even removed to the recreation yard and long before the Detainees discovered that they might have to remain in the yard for a few hours), _see_ Compl. at 10-13, registering even double-hearsay observations having no legal value whatsoever, _see,_ _e.g.,_ Compl. at 12 (stating that, at 2:29 P.M. on August 30, 2007, "[t]his Writer [was] informed by another [Detainee] that the officers [were] over[]heard . . . saying that [Plaintiff] Howard was alright when the [a]mbulance left [the Facility] with [Plaintiff Howard] in it");[27] and (b) Plaintiff Banda's intentional

---

[27]

Plaintiff Banda's interest in legal rights of third parties has no valid legal basis. Plaintiff Banda is unable to raise any claim stated in the Complaint _jus tertii_, _i.e.,_ on behalf of any other Detainee or Plaintiff. Under the "next friend" doctrine, standing is allowed to a third person so this third person could file and pursue a claim in court only on behalf of someone who is unable to do so on his or her own. The doctrine dates back to the English Habeas Corpus Act of 1679 and provides a narrow exception to the "case in controversy" requirement set forth in the Article III of Constitution. _See_ _Whitmore v. Arkansas_, 495 U.S. 149, 154-55 (1990). The _Whitmore_ Court set out two requirements that should be met by the one seeking to qualify for "next friend" standing: (1) "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf [(s)he] seeks to litigate" (and it has been further suggested that a "'next friend' must have some significant relationship with the real party in interest"; and (2) "the 'next friend' must provide an adequate explanation--such as inaccessibility, mental incompetence, or other disability--why the real party in interest cannot appear on his own behalf to prosecute the action." _Id._ at 163-64. The burden is on the "next
(continued...)

capitalization on the fact that the requirements of Prison Litigation Reform Act (hereinafter "PLRA") are inapplicable to involuntarily civilly-committed violent sexual predators like himself.[28] See id. at 2 (enlightening the Court of the scope of the PLRA by citing a case issued by the Court of Appeals for the Ninth Circuit and placing this citation and accompanied language in an asterisked box opening with the "ATTENTION TO THE COURT" entry, in capital letters, in an apparent effort to remind the Court that

---

[27](...continued)
friend" to justify his/her status and, thereby, to obtain the jurisdiction of the federal courts. See id. at 164. In view of these requirements, Plaintiff Banda cannot be recognized as "next friend" of any Detainee or Plaintiff, since the Complaint has no information as to whether Plaintiff Banda is "truly dedicated to the best interests" of such other Detainee or Plaintiff, nor does the Complaint indicate that any other Detainee or Plaintiff is unable to pursue his own claim(s). Accord Coalition of Clergy v. Bush, 310 F.3d 1153, 157-59 (9th Cir. 2002) (providing a thorough discussion of the "next fiend" case law).

[28]
In 1996, Congress enacted the PLRA, Title VIII of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321 (April 26, 1996). Congress's purpose in enacting the PLRA was "primarily to curtail claims brought by prisoners under 42 U.S.C. § 1983 and the Federal Tort Claims Act . . . many of which are routinely dismissed as legally frivolous." Santana v. United States, 98 F.3d 752, 755 (3d Cir. 1996). A crucial part of the congressional plan for curtailing meritless prisoner suits is the requirement, embodied in 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), that a court must dismiss, at the earliest practicable time, any prisoner actions that are frivolous or malicious, fail to state a claim, or seek monetary relief from immune defendants. Plaintiff Banda, apparently, capitalizes on the fact that the actual language of the PLRA is inapplicable to involuntary civilly-committed violent sexual predators transformed into recreational litigants like Plaintiff Banda, even though it appears that the spirit of the PLRA would be in line with such a limitation. See id.

Plaintiffs, Plaintiff Banda included, are exempt from the limitations of the PLRA).

Since it appears that Plaintiff Banda's ability to keep filing meritless legal actions, if not curtailed, is likely to enable Plaintiff Banda to (a) unduly "piggy-back" on potentially valid claims by other Detainees or Plaintiffs, (b) exert undue power--or, at the very least, undue influence--over other Detainees or Plaintiffs who might have preferred not to prosecute a legal action of any kind, or might have elected to set forth a claim of factual or legal nature different from that selected by Plaintiff Banda, (c) groundlessly harass the Facility officials and/or other governmental defendants, and (d) prey, without any valid reason, on this District's limited resources by taking an undue advantage of the narrow scope of the PLRA, this Court concludes that adoption of certain preventive measures is warranted in order to protect this District, government officials, as well as the Detainees of the Facility, from Plaintiff Banda's passion for recreational litigation.[29]

---

[29]
    Had Plaintiff Banda not completed serving his prison term as of the date of his filing of the instant Complaint, he would *not* be able to have the Complaint filed in this matter in forma pauperis, in view of the limitation imposed by the "three strikes" rule, 28 U.S.C. § 1915(g). See Banda v. Brown, 2007 U.S. Dist. LEXIS 39955 (summarily dismissing the complaint); Banda v. McGreevey, 2006 U.S. Dist. LEXIS 66907 (same); Banda v. N.J. Special Treatment - Annex, Civ. No. 05-2078 (same); Banda v. N.J. Dep't of Mental Health Servs., 2005 U.S. Dist. LEXIS 19560 (same); Banda v. New Jersey, 2004 U.S. Dist. LEXIS 28503 (same).

Therefore, this Court will enjoin the Clerk of the Court from opening any new docket based on pleadings in which Plaintiff Banda is designated as a pro se in forma pauperis plaintiff, unless leave is first obtained from the Court upon establishing that the submission presents, at the very least, a non-frivolous colorable argument for the requested relief.[30]

---

[30] In seeking leave of Court, Plaintiff Banda must certify in writing that (a) the claims he wishes to present are new claims never before raised and disposed on merits by any federal court, (b) he believes the facts alleged in his proposed complaint to be true, and (c) he knows of no reason to believe his claims are foreclosed by controlling law. For instance, if Plaintiff Banda submits for filing another pro se in forma pauperis complaint alleging that his constitutional rights were violated because, after being remaining in a recreation yard for three to five hours on a summer morning, he (a) developed "puffy eyes" and sunburn on his forehead and nose (of which he complained to a doctor three days later, and which were successfully treated with Tylenol and an over-counter-prescription cream), (b) was "emotionally traumatized" by the sight of arms in the hands of corrections officers, and (c) displeased with the fact that the water served to him was insufficiently chilled, no new matter would be opened by the Clerk to entertain such complaint.

Plaintiff Banda is expressly cautioned against attempting to circumvent this measure by intentionally mislabeling his civil rights applications as other types of actions, e.g., as habeas applications. " The concept of 'abuse of the writ' is founded on the equitable nature of habeas corpus. . . . Where a prisoner . . . engages in [a] conduct that disentitles him to the relief he seeks, the federal court may dismiss [his application] on the ground that the prisoner has abused the writ." Kuhlmann v. Wilson, 477 U.S. 436, 445 n. 6 (1986) (citations and internal quotation marks omitted.

The Court expressly notes that the Clerk shall open new dockets based on any legal matter to which Plaintiff Banda is a party if Plaintiff Banda acts in his capacity of a *represented* plaintiff, since the scope of Rule 11 would allow the judge assigned to any such represented matter to respond properly to filing of a frivolous complaint.

Needless to say, all Plaintiff Banda's submissions, either pro
(continued...)

## **CONCLUSION**

For the above stated reasons, the Court will grant Plaintiffs' application to file the Complaint in forma paupeis without prepayment of the filing fee.

The Court will dismiss Plaintiffs' Complaint **with prejudice** with regard to all named Defendants except for Defendants Jack/Joan Does, 1-40, respectively.

The Court will deny certification of Plaintiffs' Class and/or Sub-Classes for failure to meet the numerosity, typicality, adequacy, predominance and superiority requirements. The Court will direct the Clerk to (a) retain this matter as an individual matter of Plaintiff Banda (hereinafter "Banda Matter"), and (b) open individual matters for Plaintiffs Harrell, Bagarozy, Creveling, Sanchez, Delstritta, Marino, Haines, Rodriguez, Quick, Conkright, Salerno, Conn, Walker, Howard and Williams (hereinafter "Newly Open Cases").

The Court will dismiss the Complaint **with prejudice** as to Plaintiffs' Fourth Amendment claims.

The Court will dismiss the Complaint **without prejudice** as to Plaintiffs Haines, Rodriguez, Quick, Conkright, Salerno, Conn and

---

[30] (...continued)
se or represented, should be filed if these submissions are accompanied by the applicable filing fee. Accord 28 U.S.C. § 1915(g). (While Plaintiffs appear to be of impression that the filing fee is $150, see Compl. at 2, Effective April 9, 2006, the civil filing fee increased from $150 to $ 250, effective March 7, 2005, and from $250 to $ 350, effective April 9, 2006.)

Walker's due process claims. These Plaintiffs may cure the deficiencies of the Complaint identified in the instant Opinion by filing their individual amended complaints, within thirty days from the date of entry of the Order accompanying the instant Opinion, if (a) on August 30, 2007, these Plaintiffs were actually prevented from clothing themselves or taking their hats while being removed to the recreation yard, and such amended complaints detail the exact language, actions and other circumstances of the alleged preventive measures, as well as the identities of defendants that employed the alleged preventive measures, and/or (b) these Plaintiffs experienced serious medical need on August 30, 2007, when they contacted the Facility's medical staff but were unduly denied medical attention by the Facility's medical staff.[31]

---

[31]

In the event that any Plaintiff was suffering of medical conditions that was known to such Plaintiff as of August 30, 2007, and was known to cause this Plaintiff a serious health risk if the Plaintiff is exposed to direct sunlight without having protection of a hat and/or bodily garment, such Plaintiff should detail in his amended complaints whether, on or prior to August 30, 2007, 8:30 A.M., he expressly advised the Facility officials about his then-existing medical condition (and ensuing health risk of exposure to direct sunlight). The amended complaints should state the identities of particular Defendants that prevented Plaintiffs from clothing themselves and/or taking their hats, and specify the preclusive measured actually used by the corrections officer(s).

In addition, each such amended complaints should identify the particular serious medical need(s) experienced by the Plaintiff on August 30, 2007, or shortly thereafter, as well as the exact circumstances of the alleged undue denial of medical care.

Finally, in the event Plaintiffs are unable to identify particular Defendants, each amended complaint should provide the Court with information indicating that the Plaintiff would be able to establish such identities in a reasonably foreseeable future.

The Court will dismiss the Complaint **without prejudice** as to Plaintiffs Howard and Williams' due process claims. These Plaintiffs may cure the deficiencies of the Complaint identified in the instant Opinion by filing their individual amended complaints, within thirty days from the date of entry of the Order accompanying the instant Opinion, if (a) on August 30, 2007, these Plaintiffs were actually prevented from clothing themselves or taking their hats while being removed to the recreation yard, and such amended complaints detail the exact language, actions and other circumstances of the alleged preventive measures, as well as the identities of defendants that employed the alleged preventive measures, and/or (b) these Plaintiffs experienced serious medical need on August 30, 2007, but were unduly denied medical attention by the hospital staff and/or ambulance personnel.[32] Such amended complaints should indicate the grounds for these Plaintiffs' assertion that the hospital/ambulance personnel were acting under the color of law.

The Court will dismiss the Complaint **with prejudice** as to all Plaintiffs Banda, Harrell, Bagarozy, Creveling, Sanchez, Delstritta and Marino's due process claims.

---

[32] <u>See</u> note 31, this Opinion.

The Court will direct the Clerk to close the Banda Matter, as well as all Newly Open Cases of Plaintiffs Harrell, Bagarozy, Creveling, Sanchez, Delstritta and Marino.[33]

---

[33]

Even though the Court will dismiss the Complaint as to all Plaintiffs Harrell, Bagarozy, Creveling, Sanchez, Delstritta and Marino's claims with prejudice and direct the Clerk to close the Newly Opened Cases for these Plaintiffs in view of the fact that the Complaint fails to state a cognizable claim on behalf of any of them, the Court is mindful of the possibility that some of these Plaintiffs might have been so dominated by Plaintiff Banda and/or subjected to "peer-pressure," that they could have been forced to sign the Complaint without even reading and/or to forfeit certain non-frivolous claims that they wished to have included in the Complaint. (While it appears that Plaintiffs Harrell, Bagarozy, Marino and Sanchez initiated previous pro se in forma pauperis civil rights action in this District, in the amount ranging from one to three actions per Plaintiff, it appears that Plaintiffs Creveling and Delstritta did not file any previous actions of any kind with this District. Therefore, the Court cannot rule out the possibility that Plaintiffs less sophisticated in legal matters might have been unduly dominated by other Plaintiff(s) who self-declared themselves as "legal experts.") Consequently, the Court reminds these Plaintiffs Harrell, Bagarozy, Creveling, Sanchez, Delstritta and Marino that any of them may, within ten days from the date of entry of the Order accompanying the instant Opinion, file with the Clerk their *individual* motions for reconsideration of the Order, reopening of their individual Newly Open Cases, and to file their *individual* amended complaints (in addition to any other grounds that Plaintiffs may raise under Rule 59(e), as clarified in Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985), cert. denied, 476 U.S. 1171 (1986); Assisted Living Assocs. of Moorestown, L.L.C., v. Moorestown Tp., 996 F. Supp. 409, 442 (D.N.J. 1998)). In other words, in the event any of these Plaintiffs (a) has a **bona fide** belief that his constitutional rights were actually violated during--or in relation to--the events of August 30, 2007, (b) relies on facts **other** than those expressly stated in the Complaint, and (c) elects to make a motion to reopen his matter and for leave to file an amended complaint, such Plaintiff should include in his motion a statement clarifying the facts underlying the alleged constitutional violation, together with an explanation as to why these factual predicates were omitted from the instant Complaint. (It appears that Plaintiff Banda,
(continued...)

The Court will direct the Clerk to administratively terminate all Newly Open Cases of Plaintiffs Haines, Rodriguez, Quick, Conkright, Salerno, Conn, Walker, Howard and Williams, subject to reopening in the event these Plaintiffs timely submit for filing their amended complaints.[34]

The Court will direct the Clerk to provide Plaintiffs Haines, Rodriguez, Quick, Conkright, Salerno, Conn, Walker, Howard and Williams with a blank form of § 1983 complaint (for the purposes of filing amended complaints, if these Plaintiffs elect to make such filings), together with a notice, pursuant to 28 U.S.C. § 1915(e)(1) and § 4(a) of Appendix H of the Local Civil Rules, informing each Plaintiff of the opportunity to apply in writing for the appointment of pro bono counsel in accordance with the factors set forth in Tabron v. Grace, 6 F.3d 454 (3d Cir. 1997), and will direct the Clerk to enclose with such notice a copy of Appendix H and a form Application for Appointment of Pro Bono Counsel.

---

[33](...continued)
being the "Writer" of the Complaint, see Compl. at 12, had a fair opportunity to present all his claims to this Court when he was composing this twenty-two page document. The foregoing, however, does not preclude Plaintiff Banda from making a motion on the grounds stated in Rule 59(e), as clarified in Harsco and Assisted Living.)

[34]
An administrative termination of any such Newly Open Cases is not a "dismissal" for purposes of the statute of limitations, and that if any of such Newly Open Cases is reopened pursuant to the terms of this Order, it is not subject to the statute of limitations bar, provided the original Plaintiffs' complaint in this action was timely filed. See McDowell v. Delaware State Police, 88 F.3d 188, 191 (3d Cir. 1996).

(Plaintiffs, however, are reminded that such appointment is neither guaranteed nor automatic.)

The Court will enjoin the Clerk from opening a new docket based on any legal matter where Plaintiff Banda seeks to act in his capacity of a <u>pro se in forma pauperis</u> plaintiff while asserting a civil rights violation, unless Plaintiff Banda first seeks and obtains leave of Court by establishing to the Court's satisfaction that the complaint he wishes to file presents, at the very least, a non-frivolous colorable argument for the requested relief.

An appropriate Order accompanies this Opinion.


s/William J. Martini

_____
        **WILLIAM J. MARTINI**
   **United States District Judge**

Dated: November 1, 2007


Page 63 of  63